T.C. Memo. 1996-486


UNITED STATES TAX COURT


ELECTRIC CONTROLS AND SERVICE CO., INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23672-93.                    Filed October 29, 1996.


<u>William S. Fishburne III</u> and <u>Sidney T. Philips</u>, for
petitioner.

<u>Linda J. Wise</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


SWIFT, <u>Judge</u>:  Respondent determined a deficiency in
petitioner's 1989 corporate Federal income tax of $218,015 and an
addition to tax under section 6651(a)(1) of $66,778.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1989, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement, the primary issue for decision is the proper accrual in petitioner's taxable year ending February 28, 1989, of amounts billed but not received under a long-term construction contract.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is an Alabama corporation with its principal place of business in Birmingham, Alabama. Petitioner is engaged in the construction of industrial plants and buildings. Petitioner's taxable year ends on February 28 of each year.

In early 1987, Clinch River Corp. (Clinch River) incorporated for the purposes of purchasing, renovating, and operating a paper mill that it purchased later that year. In October of 1987, Clinch River hired petitioner to substantially renovate the mill. The mill had been built in the early 1900's but had been closed in 1985 upon bankruptcy of the former owner and operator of the mill.

Under the long-term, cost-plus contract that was entered into on October 23, 1987, between Clinch River and petitioner (October 1987 contract), Clinch River was to reimburse petitioner the costs of labor, materials, and subcontractor fees, and to pay

petitioner a fee of 15 percent in excess of labor and material costs and subcontractor fees. Clinch River had little startup capital and was required to take out lines of credit to finance the mill renovation.

Under the October 1987 written contract, total payments due petitioner for renovation of the mill were estimated at $2,730,000, and completion of the renovation was estimated for March 1, 1988. Payments were to be made by Clinch River to petitioner periodically as renovation of the mill progressed, and final payment was to correspond with the completion of the renovation.

Not until July of 1988, however, did petitioner complete renovation of the mill, and, by the time the renovation was complete, total payments due petitioner from Clinch River under the cost-plus contract had increased to $5,136,000.

Because of the large increase in the costs of renovation over the $2,730,000 that petitioner initially had estimated and because of financial difficulties that Clinch River experienced during renovation of the mill, Clinch River did not make timely payments to petitioner, and both Clinch River and petitioner recognized that Clinch River would have difficulty making the full payment due petitioner for petitioner's renovation of the mill. By letter dated April 18, 1988, petitioner wrote Clinch River and offered to make adjustments in the payments due petitioner from Clinch River for renovation of the mill.

Between January and July of 1988, under the October 1987 contract, Clinch River made payments to petitioner totaling $3,180,000, leaving a balance of $1,956,000 ($5,136,000 less $3,180,000 equals $1,956,000) to be paid upon completion of the mill renovation which balance, in July of 1988, was accrued as income on petitioner's books and records.

Upon completion of the renovation, the mill reopened, and Clinch River began operating the mill 7 days a week. Clinch River, however, failed to pay the $1,956,000 balance due petitioner under the October 1987 cost-plus contract.

By letter dated July 11, 1988, Clinch River wrote petitioner and acknowledged the $5,136,000 total bill for renovation of the mill, but Clinch River also requested additional time to pay the $1,956,000 balance due. Specifically, Clinch River represented that by October 30, 1988, it would make an additional payment of $603,000 to be financed from additional loan proceeds. Clinch River made no representation as to when it would pay the amount due in excess of $603,000.

By letter dated October 25, 1988, Clinch River informed petitioner that it would not be able to pay the $603,000 promised by October 30, 1988. Clinch River had no capital, operating funds, or credit from which to make the payment.

Due to Clinch River's financial condition, petitioner and Clinch River renegotiated certain aspects of the cost-plus contract relating to renovation of the mill and specifically

relating to payment of the $1,956,000 balance due petitioner. Under a written agreement dated November 23, 1988 (November 1988 contract), Clinch River agreed, among other things, to pay petitioner:

(1) $400,000 by January 15, 1989;

(2) beginning with the mill's first profitable quarter, $5 per ton for each salable ton produced, for a period of up to 24 months, up to a maximum total additional payment under this provision of $400,000; and

(3) in each month of 1989 that is profitable for the mill, an additional $5 per ton for all tons produced in each month;

(4) in the event Clinch River sells the mill and receives from the sale less than $12 million, an additional amount so that the total amount paid petitioner for renovation of the mill would equal $4.4 million. Alternatively, if a sale of the mill realizes for Clinch River more than $12 million, an additional amount so that the total amount paid petitioner for renovation of the mill would equal $4.5 million.

Because of the above alteration of the October 1987 contract, on January 4, 1989, an adjustment reducing accrued income by $724,975 was made on petitioner's management reports with respect to its renovation of the mill to reflect that, as of November 30, 1988, petitioner had the potential to receive a total of only $4,411,025 from its work on the mill -- $5,136,000 (total contract amount as of completion of the renovation) less $4,411,025 (approximate minimum that petitioner was scheduled to receive, under the November 1988 contract, on sale of the mill) equals $724,975.

On January 15, 1989, Clinch River failed to make the $400,000 payment due petitioner on that date under the November 1988 contract.

On February 2, 1989, petitioner and Clinch River renegotiated in writing certain aspects of the November 1988 contract (February 1989 contract). Under the February 1989 contract, in lieu of the $400,000 that was due petitioner on January 15, 1989 (under the November 1988 contract), Clinch River agreed to pay directly to various suppliers and subcontractors $340,148 that was owed by petitioner to the suppliers and subcontractors for their work on the mill renovation, and Clinch River agreed to pay petitioner only the $59,852 balance of the $400,000 that was scheduled to be paid on January 15, 1989 ($400,000 less $340,148 equals $59,852). Under the February 1989 contract, the two other provisions of the November 1988 contract that made additional payments from Clinch River to petitioner contingent upon Clinch River's profitability and production remained in effect. The provisions of the November 1988 contract relating to a possible sale of the paper mill are not mentioned in the February 1989 contract.

From the time of initial startup of the mill in July of 1988 through the end of petitioner's 1989 taxable year, Clinch River's financial statements reflected a total net operating loss of $4,340,926 and no profit from operation of the mill. Petitioner received copies of Clinch River's monthly financial statements from July of 1988 through the end of Clinch River's fiscal year

ending July 2, 1989.  Each of these monthly financial statements
reflected total liabilities in excess of total assets and a net
operating loss for Clinch River that increased significantly for
almost every month, as set forth below:

| Month Ending | Total Assets | Total Liabilities | Net Operating Loss (To Date) |
|---|---|---|---|
| July 31, 1988 | $10,812,640 | $12,231,286 | $   (609,170) |
| Aug. 28, 1988 | 10,623,865 | 12,798,253 | (1,309,637) |
| Sep. 25, 1988 | 10,745,749 | 13,978,696 | (2,352,740) |
| Oct. 23, 1988 | 11,430,129 | 15,014,491 | (2,651,004) |
| Nov. 20, 1988 | 10,468,891 | 14,703,381 | (3,234,931) |
| Dec. 18, 1988 | 10,571,153 | 15,344,598 | (3,704,189) |
| Jan. 15, 1989 | 10,518,158 | 15,573,595 | (3,935,168) |
| Feb. 13, 1989 | 10,325,572 | 15,893,548 | (4,340,926) |
| Mar. 12, 1989 | 9,200,617 | 15,190,987 | (4,704,722) |
| Apr.  9, 1989 | 9,123,278 | 15,722,158 | (5,206,418) |
| June  4, 1989 | 9,086,060 | 16,568,885 | (5,938,446) |
| July  2, 1989 | 9,072,587 | 17,057,265 | (6,372,108) |

In order to cover expenses associated with production, the
paper mill apparently had to produce and sell at least 170 tons
of paper per day.  As of January 25, 1989, the paper mill was
apparently producing only 150-170 tons of paper per day, dropping
to 123 tons per day as of April 9, 1989, and rising to 140 tons
per day as of July 30, 1989.

In summary, with regard to payments due from Clinch River,
as of February 28, 1989, the close of petitioner's 1989 taxable
year, petitioner had not received from Clinch River the
$1,956,000 balance due under the original October 1987 contract,
the $400,000 due under the first provision of the November 1988
contract, nor the $59,852 due under the first provision of the

February 1989 contract. The $340,148 that Clinch River owed suppliers and subcontractors under the February 1989 contract was never paid, and petitioner never received any payments under the provisions of the November 1988 contract that were dependent on the mill's profitability and production.

By February 28, 1989, several priority deeds of trust had been filed in Tennessee by other creditors against Clinch River and perfected against the mill and other property of Clinch River in the total amount of $4,469,999.

On March 19, 1989, yearend closing adjustments were made on petitioner's books and records with respect to petitioner's taxable year ending February 28, 1989, reflecting a reduction in the contract price for petitioner's renovation of the mill from the original $5,136,000 to $4,500,000. On petitioner's books and records, petitioner recorded this adjustment as a debit (or reduction) of $636,000 in accrued income and as a credit (or decrease) of $636,000 in petitioner's accounts receivable with respect to Clinch River ($5,136,000 less $4,500,000 (maximum amount that petitioner would receive under the November 1988 contract on sale of the mill) equals $636,000).

Petitioner also made a yearend closing adjustment on its books and records with respect to petitioner's taxable year ending February 28, 1989, to reflect the $340,148 that petitioner would not receive because Clinch River had agreed to pay the $340,148 directly to suppliers and subcontractors but that

petitioner had previously accrued as income as part of the total $5,136,000 contract price under the cost-plus contract with Clinch River. This adjustment was reflected as a further debit (or reduction) of $340,148 in accrued income and as a credit (or decrease) of $340,148 in petitioner's accounts receivable with respect to Clinch River.

Lastly, as a further yearend closing adjustment on its books and records with regard to its contract with Clinch River, petitioner "wrote-down" the original $5,136,000 contract price by an additional $600,000 to reflect what petitioner perceived as the unlikelihood of receiving any further payments under the November 1988 and February 1989 contracts with Clinch River that were dependent on profitability and production of the mill. This adjustment was reflected by a $600,000 debit (or increase) to a bad debt expense account and by a $600,000 credit (or decrease) to petitioner's accounts receivable with respect to Clinch River.

On July 11, 1989, petitioner filed suit against Clinch River in the Chancery Court for Roane County, Tennessee, seeking to recover $1,956,000 (the balance due under the original October 1987 contract between Clinch River and petitioner) with respect to its renovation of the paper mill.

On April 9, 1990, Clinch River filed for chapter 11 bankruptcy in the U.S. Bankruptcy Court (Bankruptcy Court) for the Southern District of Ohio. As of the date of trial, Clinch River was operating under a plan of reorganization that was

confirmed by the Bankruptcy Court on July 19, 1993.  As indicated above, petitioner never received any additional payments from Clinch River.

Petitioner filed an untimely corporate Federal income tax return for its taxable year ending February 28, 1989 (the 1989 return).  The 1989 return was originally due on May 15, 1989, but petitioner on that date obtained a filing extension until November 15, 1989.  Respondent, however, did not receive petitioner's 1989 corporate Federal income tax return until June 25, 1990.

On the application for automatic extension of time to file its 1989 return, petitioner reported a tentative tax liability of $80,000, an estimated tax payment of $20,000, and an estimated balance due of $60,000.  The $60,000 payment that was to accompany petitioner's extension request was not received by respondent until May 17, 1989.

Consistent with the above yearend closing adjustments that were made on petitioner's books and records with regard to payments due from Clinch River, on petitioner's 1989 corporate Federal income tax return, petitioner accrued $4,159,852[1] in income, and petitioner claimed a $600,000 bad debt deduction with

---

[1]     $5,136,000 (initially accrued on petitioner's books and records) less $636,000 (for first contract price adjustment) less $340,148 (for amount to be paid by Clinch River directly to suppliers and subcontractors) equals $4,159,852.

respect to payments not received from Clinch River for petitioner's renovation of the mill.

On audit, respondent accepted petitioner's reductions of $636,000 and $340,148 to the originally accrued total income of $5,136,000 relating to petitioner's contract with Clinch River. Respondent, however, issued a notice of deficiency disallowing the claimed $600,000 bad debt deduction on the ground that petitioner had not established that the balance of the debt still owed to petitioner from Clinch River was wholly or partially worthless.

In the notice of deficiency, respondent also determined that petitioner was liable for an addition to tax under section 6651(a)(1) for failure to timely file a 1989 corporate Federal income tax return. Because petitioner's $60,000 estimated tax payment due with the May 15, 1989, extension request was not received by respondent until 2 days after that date, this $60,000 payment was not included by respondent in the computation under section 6651(b) of the amount of the delinquency addition to tax under section 6651(a)(1).

Petitioner now argues, in the alternative, that either the $600,000 claimed bad debt deduction should be allowed or the 1989 yearend accrued income of $4,159,852 relating to the contract with Clinch River should have been, and should now be, reduced by an additional $600,000 because of the contingencies associated with Clinch River's obligation to make further payments to

petitioner and because of substantial doubt, as of February 28, 1989, as to collectibility of any further payments from Clinch River. Petitioner also makes other alternative arguments.

OPINION

Generally, under section 451(a) and the regulations thereunder, an accrual basis taxpayer is required to accrue for each year income where, during that year, all events have occurred that fix the taxpayer's right to receive the income and where the amount can be determined with reasonable accuracy. Secs. 1.446-1(c)(1)(ii), 1.451-1(a), Income Tax Regs. The time when income accrues is largely a question of fact. San Francisco Stevedoring Co. v. Commissioner, 8 T.C. 222, 226 (1947).

Income that satisfies the all-events test of the accrual method of accounting is generally accruable even though later events may postpone, even until a subsequent year, actual payment and receipt of the amount fixed and due. Harmont Plaza, Inc. v. Commissioner, 64 T.C. 632, 648, 649 (1975), affd. 549 F.2d 414 (6th Cir. 1977); Georgia School-Book Depository, Inc. v. Commissioner, 1 T.C. 463, 468 (1943).

A limited exception to the above general rule regarding the accrual of income may apply when, in the same year that a taxpayer's right to income arises, collection and receipt of the income become sufficiently doubtful or when it becomes reasonably certain that the income will not be collected. Clifton

Manufacturing Co. v. Commissioner, 137 F.2d 290, 292 (4th Cir. 1943), revg. on the facts 1 T.C. 71 (1942); Corn Exch. Bank v. United States, 37 F.2d 34, 35 (2d Cir. 1930); Harmont Plaza, Inc. v. Commissioner, supra at 649-650; Chicago & N.W. Ry. v. Commissioner, 29 T.C. 989, 996 (1958); Georgia School-Book Depository, Inc. v. Commissioner, supra at 468-469; Atlantic Coast Line R.R. v. Commissioner, 31 B.T.A. 730, 749 (1934), affd. 81 F.2d 309 (4th Cir. 1936); Johnson v. Commissioner, T.C. Memo. 1982-517, affd. without published opinion 729 F.2d 1447 (3d Cir. 1984); Cappuccilli v. Commissioner, T.C. Memo. 1980-347, affd. 668 F.2d 138 (2d Cir. 1981).

Mere financial difficulty of the debtor, however, or the fact that a lapse of time is contemplated before payment is possible will not be regarded as establishing the requisite doubtful collectibility. Harmont Plaza, Inc. v. Commissioner, supra at 650; Commercial Solvents Corp. v. Commissioner, 42 T.C. 455, 470 (1964); Automobile Ins. Co. v. Commissioner, 72 F.2d 265, 267-268 (2d Cir. 1934).

Accrual of income also may not be required if the right to receive income is contingent upon the happening of a future event. See Guarantee Title & Trust Co. v. Commissioner, 313 F.2d 225, 227 (6th Cir. 1963), revg. on the facts T.C. Memo. 1961-122. Where receipt of income is contingent on realization of profits or net income by the payor, the income may be regarded as contingent and nonaccrual in the current year may be justified.

Pierce Estates, Inc. v. Commissioner, 195 F.2d 475, 477 (3d Cir. 1952), revg. on the facts 16 T.C. 1020 (1951).

Respondent cites Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934), for the proposition that an absolute rule exists that once an accrual method taxpayer has earned income, the income must immediately be accrued, and subsequent events occurring within the same year affecting collectibility of the income can never justify nonaccrual of the income in that year. Respondent's interpretation of Spring City Foundry Co. v. Commissioner, supra, is not followed by the above-cited case authority, and we do not so interpret it herein.

In the instant case, the record establishes that by November 23, 1988 (the date of the November 1988 contract), Clinch River's obligation to pay petitioner the $600,000 in issue had become contingent and, by February 28, 1989, of very doubtful collectibility. The unprofitability of the mill, the low level of production of the mill, and the serious financial condition and apparent insolvency of Clinch River, make clear the strong unlikelihood that petitioner would receive a payment under the two contingent provisions of the November 1988 and the February 1989 contracts with Clinch River. No realistic prospect of a sale of the mill was evident, and, in light of the failure to mention, in the February 1989 contract, the sale provisions of the November 1988 contract, those provisions appear not to have been included in the February 1989 contract.

The doubtful collectibility of the $600,000 in dispute is established by the contingent nature of petitioner's right to receive any further payments and by Clinch River's serious financial condition and history of delinquent payments under the various contracts.

These factors taken together constitute and are to be regarded as more than mere obstacles postponing payment and receipt of the $600,000 in dispute. The combination of the contingent nature of the payments that were due and the severe financial condition of Clinch River created serious and reasonable doubt as to whether petitioner would ever collect any portion of the $600,000 in dispute and justify, in this case, nonaccrual of this $600,000 in petitioner's 1989 taxable year.

The fact that petitioner, in subsequent years, sued Clinch River for recovery of the full balance due under the original October 1987 contract does not alter our conclusion herein. Such legal action, in this case, must be regarded as merely protective and perfunctory. It did not alter or eliminate the price reductions that had occurred and that respondent recognizes herein, and it did not alter or eliminate the unlikelihood that petitioner would receive any additional payment from Clinch River.

Because we hold for petitioner as to nonaccrual of the $600,000 in dispute, we need not address petitioner's alternative

argument regarding the claimed $600,000 bad debt deduction and other alternative arguments.

With respect to the addition to tax under section 6651(a)(1) for petitioner's failure to timely file its 1989 corporate Federal income tax return and the computation of that addition to tax, we hold for respondent.  Petitioner has offered no evidence to establish reasonable cause for its failure to timely file its 1989 corporate Federal income tax return nor any evidence to establish that the $60,000 estimated tax payment was made on May 15, 1989, the due date of the estimated tax payment for purposes of computing the amount of the addition to tax under section 6651(a)(1).  We sustain respondent on these issues.

Decision will be entered

under Rule 155.